*Hallam & Lindsey, for appellees.*

---

## WM. DEATHERAGE et al. *v.* C. PARK et al.

Knowledge of Pecuniary Affairs Presumed — Sale of Property in Contemplation of Insolvency — Preference — Limitation — Deed of Trust for the Benefit of Creditors.

**Knowledge of Pecuniary Affairs Presumed.**

This court has frequently held that a man must be presumed to have an ordinary intelligent knowledge of his pecuniary affairs, and this presumption may be strengthened by the facts.

**Not Immoral to Secure Debt by Vigilance.**

It never has been regarded by law as immoral for a *bona fide* creditor to secure his debt by vigilance on a failing creditor, nor is same denounced as fraudulent by our Acts of 1856.

**Sale, Mortgage, or Lien to Secure One Creditor to the Exclusion of Another.**

The Statute of 1856 declares equality between creditors generally, and it makes a sale, mortgage, or lien to secure one creditor to the exclusion of others, when so made by the debtor in contemplation of insolvency and with a view of preference, to inure to the benefit of all.

**Same — Limitation.**

The Statute of 1856 does not denounce the transfer of property in contemplation of solvency as fraudulent, and, therefore, requires a creditor to claim the benefit of a transfer within six months from the delivery of the property or the recording of the transfer.

**Amended Petition.**

The amended petition was never answered and must be regarded as true, and that Phelps purchased of Parks several mules for the same purpose and same contemplation. "Several" must necessarily mean more than one mule.

**Mortgage — Contemporaneous to Debt.**
    The mortgage by Noble to Chenault was contemporaneous to his becoming Chenault's debtor, and, therefore, within the exception of the Statutes of 1856.

APPEAL FROM MADISON CIRCUIT COURT.

June 1, 1867.

OPINION OF THE COURT BY JUDGE WILLIAMS:

Deatherage, David Noble, Sr., and David Noble, Jr., and Wm. Crew were joint suretys for Carter Parks to Collins, and Deatherage was compelled to pay the debt about May 6, 1862.

That Carter Parks was then and had for more than six months previously been insolvent and unable to pay his debts is established to a reasonable certainty by the evidence.

May 7, 1862, Deatherage filed his petition against his principal and cosecurities seeking from them contribution, and alleging that various sales and transfers therein named had been made respectively by them in contemplation of insolvency and with a view to prefer some to the exclusion of other creditors, and asked that the property so sold and transferred be held for the benefit of all the creditors under the Statute of 1856.

Several suits and cross-suits were consolidated and heard together, and the court subjected some of the property to the general creditors and confirmed the sale of others; therefore, only such transfers as are involved in this appeal will be noticed, as no appeal is prosecuted from the judgment subjecting the property.

In December, 1861, Parks sold some twelve mules for $915 in discharge of a debt he then owed C. F. Burnham; the trade was made with his father, Thompson Burnham, who received the mules, and seems to have kept possession of them; these mules were received at from some $10 over their then market value. C. F. Burnham claims the mules as his, and insists that as he was not made a party to the original petition, and no allegation made against him until the amended petition was filed making him a party, and that this being more than six months after the purchase and possession of the mules, he cannot be disturbed. That if it should be regarded as a purchase by his father, he cannot be disturbed as he was no creditor of Parks, but paid for the mules *bona fidely* by settling the debt of C. F. Burnham. The court dismissed the petition as to these mules.

January 18, 1862, Parks sold to Peter Phelps thirty-two and one-fourth acres of land, and at same time transferred him a title bond of David Noble, Jr., for another tract of fourteen acres, and three days thereafter, and in the same month, conveyed to Phelps, as trustee for the benefit of his creditors, his slaves and personalty of every kind.

June 24, 1862, he filed an amended petition, alleging that previous to the deed of trust Parks had sold his relative, William Parks, several mules, and to Phelps several mules in liquidation of demands and with the design to prefer them, etc. The transfer of the title bond of David Noble, Jr., for the fourteen acres seems not to have been especially noticed in any of plaintiff's pleadings.

Phelps and William Parks are called on to disclose the number and value of the mules purchased, and from the response and evidence it appears William Parks got two mules at $160, January 2, 1862, on a debt he held on Carter Parks, but neither the response nor evidence shows whether Phelps got any.

The court held the thirty-two and one-fourth acres of land subject to the payment of the general creditors which Phelps had purchased, but dismissed the petition as to the fourteen acres included in D. Noble's title bond, and as to the mules alleged to have been purchased by both Phelps and William Parks.

It is insisted for Phelps that this fourteen acres is not in controversy, and that the purchase of the mules is not proven, and if it was, that it had been more than six months before the sale was attacked, and he cannot be disturbed.

Also for William Parks that his purchase was bona fide, and made more than six months before assailed.

D. A. Chenault held a note on C. Parks, W. T. Crews, and D. Noble, Jr., and C. Parks held a note on D. Noble, Jr. It was arranged by the latter with Chenault to become paymaster to him for $383.59, and at the same time executed a mortgage on thirty-six acres of land to secure it; whereupon Chenault released that much of his debt on Parks, Crews, and D. Noble, Jr. Barnett & Co. and Holloway & Co. obtained judgments against D. Noble, Sr., and had their executions ———— April 4, 1862, and caused the land so mortgaged to be levied on subject to the mortgage, and Holloway purchased it at execution sale at two-thirds of its appraised value, and paid off the mortgage all before Deatherage filed his petition.

Deatherage insists that this mortgage to Chenault was done in

contemplation of insolvency, and with a design to prefer him, and comes with the provisions of the Statute of 1856, and that it transferred all his property to his creditors, and that the subsequent executions, levies, and sale of Barnett & Co. and Holloway & Co. were illegal, and did not divest the creditors of their rights.

The court dismissed the petition as to this land.

Rice Portwood owed T. J. Noble two notes of $900 each as part of purchase price for land; T. J. Noble's vendor owed to Caperton over $1,200 for this land, which T. J. Noble was to pay, and to secure this he transferred the first note due on Portwood and a sufficiency of the second, and delivered the notes to Caperton; he also owed Phelps about $350, and transferred a sufficiency of the second note to pay this debt, which still left about $220 of the second note undisposed of by T. J. Noble. D. J. Rowland held a debt for about $462 on C. Parks, W. I. Crews, and T. J. Noble, and obtained a judgment against Parks and Crews; Noble having gone to Illinois he could not be served with process. Roland made nothing on his judgment, but by suit in chancery attached the remainder of the notes of Portwood to T. J. Noble in Caperton and Phelps' hands, in April 1862. Cox, by petition, which he made an answer and cross-suit, was made a party June 23, 1863, and he assailed these assignments to Caperton and Phelps as done in contemplation of insolvency, and with a design to prefer them by Noble, and claims that the remainder of the Portwood notes not assigned to Caperton and Phelps had been assigned to him by T. J. Noble in contemplation of insolvency and with a design to prefer him, and insists that this inured to the benefit of all the creditors of T. J. Noble; that he then held a note on C. Parks with said Noble as security.

The court dismissed his suit as to the assignments of Caperton and Phelps, from which he has not appealed; it also dismissed his suit as to the remainder of these debts, and gave Rowland the benefit thereof on his attachments, and of this Cox complains, and now insists that he has established a parol assignment of this remainder to himself and should, therefore, be preferred to Rowland's attachment.

The answer of Thompson Burnham to Deatherage's petition does not disclose any other ownership of the mules bought by him of Carter Parks than as charged in the petition and as indicated by his possession, making him the ostensible owner, nor is ownership set up by C. F. Burnham in his answer to Deatherage's

amended petition; therefore, upon the pleadings and evidence we must determine whether Thompson Burnham's purchase was made for the purpose of securing C. F. Burnham's debt, and whether the sale was made by Parks in contemplation of insolvency, and with a view to prefer some of his creditors.

C. F. Burnham in his answer says he saw Parks in October, 1861, and asked him if he wished to renew his note; that Parks answered he wanted to sell his mules and pay it, as he could not pay the 10 per cent. interest which he heretofore had been paying; that he responded to Parks he should like to accommodate him; that Parks inquired if his, Burnham's, father would not purchase; that afterward, in October or November, he went with his father to Parks' house to see the mules, but as the latter asked more than his father thought the mules worth, he declined purchasing.; Parks then expressed a desire to pay the debt and insisted on Thompson Burnham's purchasing. After this he wrote a note to his father asking him to purchase enough of these mules to pay the debt, which the latter did, at $915, and wrote him a note whilst he was in Frankfort attending the Legislature, and that he had paid from $50 to $100 more than they were worth; neither of these letters are filed as it is stated they were lost or mislaid, but C. F. Burnham's answer to his father's letter informing him of the purchase is filed, and is dated December 4, 1861, at Frankfort, Ky., in which he says:

> "If you lose anything on the mules, I *reaffirm* the loss is mine. *If you think them worth only* $10 *a head less than you paid for them, take them at that price.* I suppose the extra interest in my debt would amount to nearly that sum, certainly to $70 or $80 from the time I made the loan some four or five years ago."

The report of the master commissioner shows that the total assets of said C. Parks, subject to distribution, amounted to $3,405.60, whilst his indebtedness amounted to $9,553.75.

The sale of the mules was made to Burnham early in December, 1861, the sale of the land, etc., made to Phelps, January 18, 1862, and the deed of trust for the benefit of his creditors made by Parks to Phelps, January 21, 1862.

These facts do not permit a rational doubt that Parks believed he was insolvent when he made the sale of the mules to Burnham only a month and a few days before he made his assignment to Phelps as trustee.

This court has frequently held that a man must be presumed to have an ordinarily intelligent knowledge of his pecuniary affairs, and this presumption is strengthened not only by the facts before stated, but also from the fact that in less than four months after said deed of trust Deatherage, as the surety of Parks, was compelled under the coercive process of the law to pay a debt for him, and other creditors were pressing him.

It has never been regarded by the law as immoral for a *bona fide* creditor to secure, by vigilance, his debt on a failing creditor, nor is such denounced as fraudulent by our Act of 1856, but as that act declares equality between creditors generally, it makes a sale or mortgage or lien to secure one creditor to the exclusion of others, when so made by the debtor in contemplation of insolvency and with a view of preference, to inure to the benefit of all the creditors, and does not denounce such transaction as fraudulent, and, therefore, requires that the creditors should claim the benefit of this transfer within six months from the delivery of the property or the recording of the transfer.

This sale of the mules to Thompson Burnham must stand precisely as if made to C. F. Burnham, as his debt on Parks was the superinducing cause of the purchase and entered into the consideration of the trade from its incipiency, and as Parks was then unquestionably insolvent, it must be regarded as made on his part in contemplation of insolvency, and with a view to prefer C. F. Burnham as a creditor, and being assailed by plaintiff's original petition within six months, must inure to the benefit of Parks' general creditors.

Phelps, in his answer filed May 21, 1862, discloses that he had also bought fourteen acres adjoining the thirty-two and one-fourth acres deeded to him by Parks, and that Parks had assigned him D. Noble, Jr.'s, title bond for the fourteen acres. He also disclosed that he had allowed Parks from ten to fifteen dollars per acre more than its then value for all this land, and that Parks then owed him about $2,100 or $2,200; that in buying the fourteen acres he had agreed to arrange an outstanding vendor's lien on the land for purchase price. He also declares the very important fact that previous to this purchase he had had interviews with Parks and his brother, Shepton Parks, relative to his indebtedness, and had obtained from him a statement of his liabilities and assets and from a calculation he believed Parks was good. This fact is a volume in itself, and conclusively shows that both Phelps and Parks regarded the latter, to say the least, in failing or doubtful

circumstances, and connected with his subsequent purchases at extravagant prices, and three days thereafter with a general assignment to him for the benefit of creditors, imposes on even an unwilling mind the conviction that both Parks and Phelps then knew his failing condition and that the sales to the latter were made in contemplation thereof and with a view to secure him to the exclusion of other creditors.

. This answer first developed the sale of the fourteen acres; it does not state who had possession; its title was not recorded, being only by D. Noble title bond.

June 24th thereafter, Deatherage filed an amended petition charging a sale of several mules to William Parks and to Phelps by C. Parks with the same design of preference and in contemplation of insolvency, and also charges that said Carter Parks was still in possession of the *lands* sold by him to Phelps; this charge is as to all the lands, and although he does not specifically name the fourteen acres, yet, taking the original petition, Phelps' answer, and this amended petition, it is evident that all the parties regarded it also as in controversy, and we shall so treat it.

This amended petition was never answered, and, therefore, it must be regarded as true that Parks still remained in possession of the land, and as its title was not recorded, this amended petition was in ample time to bring it into controversy; and it must also be regarded as true that Phelps had purchased of Parks " several mules " for the same purpose and in same contemplation; " *several* " must necessarily mean more than one mule, therefore, this charge is equivalent to a charge of at least two mules; hence, the commissioner should have inquired into the number and value of these mules so sold by Parks and bought by Phelps.

We think the fourteen acres of land should stand precisely liable as the thirty-two and one-fourth acres, subject to the general creditors of Parks, after paying the vendor's prior lien which Phelps discloses, and that the number of mules and their value should be inquired into, and if sold within six months before filing the amended petition should also be held responsible in the same way, but not unless so sold or the possession delivered within that time.

The purchase and possession of the mules by William Parks was evidently more than six months before any pleadings asserting claim against him were filed, therefore, the court properly dismissed the petition as to him.

The mortgage by D. Noble, Sr., to Chenault was contemporaneous to his becoming Chenault's debtor, and, therefore, within the exceptions of the Statute of 1856, and not liable to assailment by the general creditors, and this being so, the subsequent levy of the executions of Barnett & Co. and Holloway & Co. against D. Noble, Sr., on his right of redemption, and the sale thereof, and purchase by Holloway, were unassailable under said statute, and there are no errors as to these in the judgment.

Caperton held a prior lien on D. Noble, Jr.'s, tract of land, and to secure his vendee against Caperton's prior lien Noble assigned his vendee's notes to Caperton to discharge this prior lien, and then assigned $350 of these same notes to Phelps to secure him; this left some $220 of the notes of the vendee still owing to D. Noble, Jr., which Rowland attached as a creditor of D. Noble, Jr., who had removed to Illinois.

Cox, more than a year afterward, on his own petition, became a party and assailed these assignments to Caperton and Phelps as being done in contemplation of insolvency, and to prefer, etc., and also averred that D. Noble, Jr., had with the same purpose and in same contemplation verbally assigned the remaining $220 to him.

The court dismissed his petition and gave priority to Rowland's attachment; he does not appeal from the judgment as to Caperton and Phelps, but only as to Rowland. It was too late to assail the assignment to Caperton and Phelps and as these must stand, Rowland, by virtue of his attachment, got a legal lien which Cox cannot now assail under pretense of his verbal assignment, which he now claims as transferring this $220 to him, before Rowland's attachment. This would be a departure from the objects of his suit, and, to say the least of it, is now for the first time rather ungracefully presented. The judgment is right as to this litigation.

Wherefore, the judgment is reversed, as to C. F. and Thompson Burnham and Phelps, with directions to hold the twelve mules on their real value at the time of the sale to T. Burnham, subject to the general creditors, also the fourteen acres of land included in D. Noble's title bond which C. Parks sold and assigned to Phelps after first paying the prior vendor's lien which then existed subject to the general creditors likewise, and so many mules as may have been sold and delivered to Phelps by Parks within six months previous

to filing the first amended petition by Deatherage, June 24, 1862, and as to all the other appellees the judgment is affirmed.

*Burnam & Caperton, for appellees.*